IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | \| | 13 Cr. 242 (SAS) |
| | \| | |
| | \| | The Hon. Shira A. Scheindlin |
| v. | \| | |
| | \| | |
| ROBERT TORRES, | \| | |
| | \| | |
| Defendant. | \| | |

**DEFENDANT ROBERT TORRES' POST-HEARING MEMORANDUM OF LAW**

SEAN M. MAHER
*Counsel for Defendant Robert Torres*

The Law Offices of Sean M. Maher, PLLC
233 Broadway, Suite 801
New York, NY 10279
(212) 661-5333
(212) 227-5808 fax

**Preliminary Statement**

On October 3-4, 2013 the Court conducted an evidentiary hearing concerning the pretrial suppression motions filed by Mr. Torres and his co-defendants. For the reasons previously raised by Mr. Torres, as well as for those reasons set forth below, it is respectfully requested that the Court grant Mr. Torres' motion to suppress the April 2, 2013 post-arrest statement.

**I.     The Hearing Testimony**

The government called one witness in relation to Mr. Torres' motion: FBI Special Agent Rodrigo Riveros. The defense called one witness: Mr. Torres.

**A.     Background of Mr. Torres**

Mr. Torres, 34, has been using heroin "on and off" for about seven to eight years.[1] In an effort to break his addiction to heroin, Mr. Torres enrolled in a program at St. Barnabas Hospital in 2012 and began taking methadone, which was prescribed to him through St. Barnabas Hospital.[2] Mr. Torres was participating in the methadone program in April of 2013 and had an official identification card that he needed to display in order to receive his methadone prescription of 80 milligrams per day.[3]

**B.     The Arrest of Mr. Torres**

As a part of an ongoing investigation into drug and weapons trafficking, federal and city law enforcement officials started arresting suspects on April 2, 2013.[4] On April 2, 2013 NYPD Det. Carbonell and another NYPD official arrested Mr. Torres in the area of 181st Street and

---

[1] HT 300 ("HT" denoting the official court transcript of the evidentiary hearing held on October 3-4, 2013).
[2] HT 301.
[3] HT 301-03; *see* Exhibit RT-C (admitted into evidence).
[4] HT 23.

1

Valentine in the Bronx.[5]  Riveros testified that he was not present for the arrest of Mr. Torres[6] and that he does not know what time the arrest occurred.[7]  Mr. Torres testified that Carbonell and his partner arrested Mr. Torres around 1:15-1:30 p.m.[8]

The NYPD detectives searched Mr. Torres, took his wallet out, and ordered him to sit in their car.[9]  The detectives handcuffed Mr. Torres' hands behind his back and drove him from the arrest location.[10]

### C. Transport from the Arrest Location to Federal Plaza

Mr. Torres testified that while he sat handcuffed in the police car, the detectives started driving and began asking Mr. Torres about various people.[11]  The detectives told Mr. Torres that he was "in big trouble."[12]  Mr. Torres told Carbonell that Mr. Torres "needed a lawyer."[13]

---

[5] *See* HT 308.
[6] HT 25.
[7] *See* HT 36-37.
[8] HT 305.
[9] HT 305.
[10] HT 305-06.
[11] HT 306.
[12] HT 306.
[13] Q. Did they tell you you had a right to a lawyer?
A. They didn't tell me nothing. I just told them I needed a lawyer.
Q. You told that to who?
A. To Mr. -- we call him Panama, the Spanish guy, whatever you want to call him. I told him I need a lawyer.
THE COURT: Is that one of the people who was here yesterday?
THE WITNESS: Carbonell, yes.
THE COURT: The guy who was here yesterday, the tall one that talked fast?
THE WITNESS: Yes.
Q. Detective Carbonell?
A. Yes.
HT 306.
                                    ***
Q. Did you say anything about wanting a lawyer to them?
A. Yes.
Q. What did you say specifically?

2

Carbonell and his partner ignored Mr. Torres' request for counsel.  After driving two-and-a-half to three hours in traffic, they arrived at 26 Federal Plaza.[14]

### D. The Interrogation of Mr. Torres

#### 1. Arrival at Federal Plaza and Interactions Before the Interrogation

Upon arriving at 26 Federal Plaza, Carbonell and his partner made Mr. Torres wait in the car for about 25 minutes.[15]  Riveros and Special Agent Ben Wallace put a different pair of handcuffs on Mr. Torres and brought him into the building.[16]

Mr. Torres was taken into a room and placed in a chair behind a table.[17]  His back was close to a wall that had a railing affixed to it.[18]  Mr. Torres, whose handcuffs were linked into a chain around his waist, was then handcuffed to the railing on the wall next to the chair.[19]  The awkward position of having his arm handcuffed to the railing caused Mr. Torres to have to turn his body sideways.[20]

At some point shortly after being put in the room, an unidentified agent asked Mr. Torres pedigree questions for about 15-20 minutes.[21]

While being questioned, Mr. Torres was feeling the debilitating effects of methadone

---

A. Just told them what I'm being arrested for. He didn't tell me. I said well I need to speak to a
   lawyer then to find out what's going on.
Q. Did they respond in any way when you said that?
A. Then he told me you'll find out more about it when you get downtown. That's all he told me.
Q. And then you were driving?
A. Yes. Kept driving.
HT 307.
[14] HT 308.
[15] HT 308.
[16] HT 309-10.
[17] HT 39-41.
[18] HT 40.
[19] HT 310-11.
[20] HT 311.
[21] HT 311-12.

3

withdrawal. Mr. Torres had last taken his methadone two day earlier[22] and was feeling nauseous.[23] Mr. Torres testified that he had sniffed two bags of heroin earlier in the day on April 2 to cut the edge off the methadone withdrawal.[24] Mr. Torres testified that the agent in the room with him "just stood there with me, looking at me, asked me if I want water, if I want to use the bathroom, how I'm feeling. I guess I seemed edgy. I kept moving. He's asking me what's wrong. I told him I got an addiction."[25] Specifically, Mr. Torres told the agent that "my addiction was heroin, and I missed my clinic, my dosage, whatever. He said well just hang in there, everything is going to be all right."[26]

Mr. Torres was "hurting" physically and "trying to hold it in;"[27] his mind was also "really cloudy."[28] Mr. Torres testified that the following occurred:

> A. I'm sitting there going through the motions. I started throwing up a little bit. So the guy brought the garbage can over. Started throwing up bare because I had no food or nothing in me.
> Q. You said throwing up bare?
> A. Like bare. All your insides. You ain't got nothing in you. It's coming up out of you.[29]

Mr. Torres remained handcuffed to the railing in the room for anywhere from one-and-a half to two-and-a-half hours before Riveros entered the room.[30]

### 2.   Interrogation by Riveros

Riveros testified that he read Mr. Torres his *Miranda* rights before the interrogation

---

[22] HT 303.
[23] *See* HT 310.
[24] HT 327.
[25] HT 312.
[26] HT 313.
[27] HT 313.
[28] HT 330, 337.
[29] HT 313.
[30] HT 313-13.

began.[31]  Riveros testified that Mr. Torres signed "standard FBI form advice of rights" and began answering questions.[32]  During direct examination, Riveros stated that Mr. Torres appeared "cool, calm, collected."[33]

In contrast, Mr. Torres testified that the agents started asking him questions and Mr. Torres "told them I didn't want to answer nothing until I see a lawyer."[34]  Mr. Torres testified that the following exchange then occurred:

> Q. You told them you didn't want to answer anything until you saw a lawyer?
> A. Yes, I did.
> Q. Did they respond to you when you said that?
> A. He told me well, you sick. Well, you want to go to the hospital or something? I said yeah. He said well sign this form, then we'll take you to the hospital.
> Q. So do you know which agent said that to you?
> A. Rodrigo.
> Q. Tell me one more time, as far as you can remember, specifically what did he say at that point?
> A. He came. He said Mr. Torres, how are you doing, whatever.  He started asking me, saying well, you know what's going on like? I said no. He's like do you want to answer questions.  I said no, not really. I want to see a lawyer first. I left it like that. He's like you look like you're kind of sick and everything. If you sign this form, I'm going to take you to the hospital. So I'm thinking I'm going to sign the form and go to the hospital. So I signed the form.[35]

Mr. Torres testified that he was feeling worse from the methadone withdrawal.  He signed the *Miranda* rights waiver form because he "really wanted to go to the hospital" and receive medication.[36]  Mr. Torres testified that Riveros did not read or explain the *Miranda* rights waiver form before having Mr. Torres sign it.[37]  Mr. Torres testified that signed the form without

---

[31] HT 25-26.
[32] HT 25-27.
[33] HT 29.
[34] HT 315.
[35] HT 315-16.
[36] HT 316-17.
[37] HT 317.

reading it or asking any questions because he "just wanted to go to the hospital."[38]

### D. Post-interrogation Events

After the interrogation, Riveros took Mr. Torres to the hospital.[39] Mr. Torres testified that he arrived at the hospital sometime between 11:45 p.m. and 12:30 a.m., maybe later.[40] Riveros did not recall or document what time they arrived at the hospital.[41]

Riveros testified that he took Mr. Torres to the hospital solely in order to obtain a "fit for commitment" letter.[42] After remaining at the hospital for up to two hours,[43] Riveros took Mr. Torres to MDC in Brooklyn.[44] Officials at MDC refused to accept custody of Mr. Torres because of his heroin addiction and need for methadone.[45]

Unable to release Mr. Torres to MDC, Riveros then drove Mr. Torres to MCC in lower Manhattan.[46] MCC, which has a methadone program, accepted custody of Mr. Torres sometime around 2:00 to 3:00 a.m. according to Mr. Torres.[47] A physician at MCC then examined Mr. Torres and provided methadone to Mr. Torres.[48]

## II. Legal Analysis

The April 2, 2013 post-arrest statement should be suppressed for at least three reasons under the Fifth and Sixth Amendments. First, the law enforcement agents used coercion to extract an involuntary statement from Mr. Torres by forcing Mr. Torres to choose between either

---

[38] HT 317.
[39] HT 319-20.
[40] HT 320.
[41] HT 45-46.
[42] HT 30.
[43] HT 320.
[44] HT 320-21.
[45] HT 321.
[46] HT 321.
[47] HT 321.
[48] HT 321-22.

(1) invoking his right to remain silent and to have the assistance of counsel or (2) being permitted to go the hospital to receive needed medical attention.  Second, the law enforcement agents violated Mr. Torres' rights under the Fifth Amendment and under *Miranda* and its progeny by failing to properly inform Mr. Torres of his *Miranda* rights.  Third, the law enforcement officials impermissibly denied Mr. Torres his right to counsel after Mr. Torres had requested an attorney, thus violating Mr. Torres' rights under both the Fifth and Sixth Amendments.

Mr. Torres testified credibly about the circumstances surrounding the elicitation of the April 2, 2013 post-arrest statement.  Mr. Torres is not a professional witness.  An admitted heroin addict, Mr. Torres testified in open court while handcuffed, which would be difficult for any witness, and did the best he could to accurately answer questions that were asked of him.

Mr. Torres explained how he requested a lawyer while in the police car with Carbonell and again in the interrogation room with Riveros.  Suffering from acute methadone withdrawal, Mr. Torres was forced to choose between receiving necessary medical attention for his methadone withdrawal symptoms and signing the *Miranda* rights waiver form or invoking his rights and being denied necessary medical treatment.

Mr. Torres testified truthfully about the severity of the withdrawal symptoms.  His testimony is bolstered by the evidence of his St. Barnabas identification card and the acknowledgment by Riveros that Mr. Torres needed to be taken to a hospital for a "fit for commitment" letter and that MDC refused to accept Mr. Torres because its lack of a methadone program.  These facts establish that Mr. Torres was a methadone user and needed to have regular doses of methadone to prevent various negative physical withdrawal symptoms.

Mr. Torres' truthfulness is supported by Riveros' consistent minimization of Mr. Torres'

methadone withdrawal. Whereas on direct examination Riveros stated that Mr. Torres appeared "cool, calm, collected" and not ill, on cross-examination Riveros admitted that when he "saw [Mr. Torres] in the interview room, I assumed he had some type of drug problem, judging by the way he looked."[49]

Riveros prepared only two documents memorializing the circumstances of Mr. Torres' interrogation. Both documents were admitted into evidence. Examination of the documents reveals that Riveros failed to document the true nature of Mr. Torres' methadone use and withdrawal symptoms. Riveros also failed to memorialize basic foundational chronological events, such as when Mr. Torres was arrested, when he arrived at Federal Plaza, how long Mr. Torres sat in the interrogation room, when the interrogation ended, when Mr. Torres left the interrogation room, when Mr. Torres arrived at the hospital, when Mr. Torres was denied admission at MDC, and when Mr. Torres was taken to MCC. Finally, Riveros did not video or audio record his interaction with Mr. Torres, choosing instead to draft his 302 report a week later. All of these factors cumulatively undercut the credibility of Riveros.

The government bears the burden of demonstrating that Mr. Torres' statement was voluntary.[50] Voluntariness is determined by looking at the totality of the circumstances surrounding the statement.[51] In looking at the totality of the circumstances, the Court should ask whether the confession is "the product of an essentially free and unconstrained choice by its maker."[52] The government has the burden of proving, by a preponderance of the evidence, that a

---

[49] HT 47.
[50] *See United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).
[51] *Anderson*, 929 F.2d at 99.
[52] *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988).

defendant's waiver of his rights under *Miranda* was valid.[53] "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."[54]

If the Court credits Mr. Torres' testimony, the record before the Court demonstrates that the government has failed to meet its burden. Because the totality of the circumstances indicates that Mr. Torres' testimony should be credited, the Court should suppress the April 2, 2013 statement and any evidence derived from the statement.

During the hearing, the Court raised a hypothetical question as what happens if there is a knowing and voluntary waiver of the right to counsel that follows the invocation of the right to counsel.[55] Without conceding that Mr. Torres ever waived his rights under the Fifth and Sixth Amendments, the question would appear to raise the issue addressed by the Supreme Court in *Edwards v. Arizona*.[56] The *Edwards* rule, as summarized by the Supreme Court, is as follows:

> In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), we established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation "until counsel has been made available to him," 451 U.S., at 484–485, 101 S.Ct., at 1884–1885—which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293

---

[53] *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).
[54] *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).
[55] HT 369.
[56] 451 U.S. 477, 484-85 (1988).

(1990). The *Edwards* rule, moreover, is *not* offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present. *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)."[57]

Under *Edwards* and its progeny, Mr. Torres successfully invoked the right to counsel and did not subsequently waive his right to counsel by signing the *Miranda* waiver of rights form. Suppression should be granted on this ground as well and any evidence derived from the illegally obtained statement should be suppressed under the "fruit of the poisonous tree" doctrine.[58]

## Conclusion

WHEREFORE, Mr. Torres respectfully requests that the Court grant his motion and grant such other and further relief that the Court may deem just and proper.

Dated:   New York, New York
         October 22, 2013

        Respectfully submitted,

        _____/S/_____
        SEAN M. MAHER
        SM 7568
        *Counsel for Defendant Robert Torres*
        The Law Offices of Sean M. Maher, PLLC
        233 Broadway, Suite 801
        New York, NY 10279
        (212) 661-5333
        (212) 227-5808 fax

---

[57] *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991); *see Maryland v. Shatzer*, 559 U.S. 98, 110 (2010)(holding that the *Edwards* presumption of involuntariness extends for fourteen days in break-in-custody cases).

[58] *See Wong Sun v. United States*, 371 U.S. 471 (1963).